**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | **CRIMINAL NO. 24-167** |
| KEVIN HOLLOWAY | : | |
| MARK SCOTT | | |
| LINTON MATHIS | : | |
| ATIBA WICKER | | |
| KENNETH TUCK | : | |

## GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT EVIDENCE UNDER FEDERAL RULE OF EVIDENCE 404(b)

The United States of America, by its attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, and Justin Ashenfelter, Assistant United States Attorney, hereby files this Motion *in Limine* to Admit Evidence Under Federal Rule of Evidence 404(b).

WHEREFORE, for the reasons stated in the accompanying memorandum of law, which is incorporated here by reference, the government respectfully requests its motion be granted and the Court enter an order that the testimony and evidence at issue may be admitted at trial pursuant to appropriate limiting instructions.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Justin Ashenfelter*
JUSTIN ASHENFELTER
Assistant United States Attorney

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 24-167 |
| KEVIN HOLLOWAY | : | |
| MARK SCOTT | | |
| LINTON MATHIS | : | |
| ATIBA WICKER | | |
| KENNETH TUCK | : | |

<u>**GOVERNMENT'S MOTION *IN LIMINE* AND MEMORANDUM OF LAW**</u>
<u>**TO ADMIT EVIDENCE UNDER FEDERAL RULE OF EVIDENCE 404(b)**</u>

The United States of America, by its undersigned attorneys, seeks pre-trial rulings that it

may admit in its case-in-chief the following eight categories evidence under Federal Rule of

Evidence 404(b):

(1) With respect to defendants Kevin Holloway, Mark Scott and Linton Mathis —

That these defendants and a separately-charged co-conspirator were members of a cocaine
trafficking operation from in or about 2004 through August 2006, a time period that both predates
and is included within the conspiracy as charged in Count One of the indictment, and distributed
narcotics in Philadelphia, as background evidence of the defendants' association and their
knowledge, intent and plan in committing Counts One and Two of the indictment, all of which are
permissible grounds for admission pursuant to Rule 404(b).

(2) With respect to defendant Kevin Holloway—

That Holloway planned and carried out at least two previous robberies of drug dealers in
Philadelphia in 1999, as evidence of Holloway's knowledge, intent, plan, and *modus operandi* in
committing Counts One and Two of the indictment.

(3) With respect to defendant Kevin Holloway—

That between approximately 2003 and 2004, Holloway was engaged in a cocaine
trafficking operation with a cooperating witness, and Holloway subsequently amassed a significant
drug debt owed to the cooperating witness, as evidence of Holloway's motive to commit the crimes
charged in Counts One and Two of the indictment.

1

(4) With respect to defendants Kevin Holloway and Linton Mathis—

That on or about August 29, 2005, Holloway and Mathis were arrested following the seizure of $195,826 in cash from Holloway's residence on Glenview Street in Philadelphia, resulting in a significant loss of drug proceeds that damaged their drug trafficking operation, as evidence of Holloway and Mathis' motive to commit the crimes charged in Counts One and Two of the indictment.

(5) With respect to defendant Kevin Holloway—

That on or about August 25, 2006, one day before the kidnapping and murder that is the offense conduct charged in the indictment, a package containing $101,930 in cash was seized by DEA agents at a UPS facility in Los Angeles, California, resulting in a significant loss of proceeds for Kevin Holloway's drug trafficking operation, as evidence of Holloway's motive to commit the crimes charged in Counts One and Two of the indictment.

(6) With respect to defendant Atiba Wicker—

That Wicker engaged in drug trafficking with a cooperating witness in or about 2002 and 2003, and with the victim and the cooperating witness in 2006, as evidence of Wicker's knowledge, intent, opportunity, plan, and motive to commit the crimes charged in Counts One and Two of the indictment.

(7) With respect to defendant Atiba Wicker—

That Wicker had been previously incarcerated in state prison and was on state parole at the time of the offense conduct, as evidence of his opportunity to discuss the offense conduct with a cooperating witness and another individual who participated in the related home invasion robbery.

(8) With respect to defendants Kenneth Tuck and Linton Mathis—

That Tuck and Mathis had previously been arrested and prosecuted together in 1993, as evidence of their prior criminal association and shared intent to engage in the offense conduct charged in Counts One and Two of the indictment.

In support of this motion, the government represents as follows:

## I.    BACKGROUND

On April 24, 2024, a grand jury in this District returned an indictment charging the defendants with conspiracy to commit kidnapping resulting in death, in violation of Title 18, United States Code, Section 1201(a)(1), (c) (Count One) and kidnapping resulting in death, and aiding and abetting, in violation of Title 18, United States Code, Sections 1201(a) and 2 (Count Two).

Count One charges that, between the Summer of 2006 and April 2007, the defendants conspired with one another and other individuals to kidnap Shamari Taylor in Philadelphia, in an effort to steal cocaine and drug proceeds from Taylor, and, in carrying out their plan, Taylor was murdered on August 26, 2006. Subsequently, Count One alleges that as part of the conspiracy, several defendants went to great lengths to cover up their crime by destroying evidence, burying Taylor's remains in an unmarked grave, attempting to kill one of their co-conspirators, and bribing a witness to testify falsely at a trial in state court. Count Two charges the defendants with the substantive offense of kidnapping, and aiding and abetting, resulting in Shamari Taylor's death on August 26, 2006 in Philadelphia.

The investigation of this crime spanned a 19-year period that included information from civilian witnesses and victims, cooperating witnesses, and law enforcement officers at the local and federal level. The evidence in support of the charges paints a lurid picture of greed, barbarism, ruthlessness, double-cross and tragedy. The government presents the instant motion in an effort to elucidate the circumstances and context of the offense conduct, and capture the

defendants' motives as well as their relevant and admissible conduct that is within the scope and spirit of Rule 404(b).

Rule 404(b) specifically permits the government to introduce extrinsic evidence of a defendant's background, including prior crimes, wrongs, and other bad acts to establish a defendant's motive, opportunity, intent, preparation, plan and knowledge related to commission of the charged offenses. By all reasonable predictions, this matter will resolve in a jury trial. As such, the jury is entitled to hear certain evidence that predated, and in some instances postdated, the offense conduct in order to fully understand and appreciate (1) the relevant background of the conspiracy, (2) the defendants' motives to commit the kidnapping, and (3) the defendants' knowledge, intent, preparation and plan to commit the offense conduct, all of which are permissible bases of admissibility under the Rule.

## II.    FACTUAL SUMMARY OF THE CASE

Before and during the Summer of 2006, defendant Kevin Holloway routinely sold cocaine alongside defendants Mark Scott, Linton Mathis and Co-conspirator #1[1] in Philadelphia. This drug trafficking operation was initially fueled by a source of cocaine supply in California that was established by Holloway, and enhanced locally in Philadelphia through a partnership Holloway cultivated with "Person-4" between the Fall of 2003 and February 2004. In or about 2005 and 2006, Holloway and his confederates suffered substantial financial losses in connection with their operation, to include law enforcement's seizure of drug proceeds from Holloway's Philadelphia residence in August 2005; the theft of drug proceeds from Mathis in California; and

---

[1] Any reference to an individual by moniker tracks the same reference in the indictment. In this motion, the government references Co-conspirator #1, Co-conspirator #2, Co-conspirator #3, Co-conspirator #4, Person #1 Person #4, Person #5, Person #6, Person #9, and Person #10. These are the same individuals named in the indictment.

law enforcement's seizure of additional drug proceeds concealed inside of a package mailed to California in August 2006. Holloway's losses in this regard put him into debt with Person #4, who was released from federal prison on August 4, 2006, and Holloway sought to recoup money quickly so he could repay Person #4 and get his operation back on track.

Around this time, Co-conspirator #1 forged a friendship with Co-conspirator #2, who was a cocaine dealer in Philadelphia. Co-conspirator #2 and defendant Atiba Wicker were supplied with cocaine by their mutual friend, Shamari Taylor, and they had been selling cocaine to their own customer base that was separate and distinct from Holloway's drug trafficking operation. Knowing that Holloway's drug business was in peril, Co-conspirator #1 enlisted the help of Co-conspirator #2 and Wicker to have Taylor supply Holloway with cocaine. Thereafter, in July 2006, in West Philadelphia, Taylor transferred a kilogram of cocaine to Co-conspirator #2 and Wicker who then sold it to Co-conspirator #1 and Holloway in exchange for $20,000.

In the days that followed, Holloway and Co-conspirator #1 sought to purchase more cocaine from Taylor, so they asked Co-conspirator #2 and Wicker to set up another deal. But upon further discussion and reflection, especially with insight offered by Wicker that Taylor routinely possessed upwards of 10 kilograms of cocaine at a time, the notion of Holloway purchasing more cocaine from Taylor morphed into a plan to steal cocaine from Taylor. The concept of robbing drug dealers was not an unknown venture to Holloway. Indeed, Holloway and Person #4 had a history of robbing drug dealers as early as 1999, so Holloway's familiarity with these crimes informed his approach to Taylor. Over the next few weeks, Holloway recruited the members of his already-existing drug trafficking operation – Scott, Mathis and Co-conspirator #1 – as well as two other acquaintances, Co-conspirator #3 and Co-conspirator #4.

These men were assisted by information supplied by Wicker, who provided details on Taylor's cocaine supply to ensure that it was robust when the time came to rob Taylor. Co-conspirator #2 funneled this information to Co-conspirator #1 and Holloway, and Co-conspirator #2 agreed to lure Taylor to a specific location so he could be robbed.

During the planning phases of the plot, Holloway envisioned his accomplices dressing up as police officers so they could kidnap Taylor, which would be perceived as a lawful arrest without raising Taylor's suspicion at the time of the robbery. This idea caused Co-conspirator #1 to recruit his cousin, defendant Kenneth Tuck, to join the plot because Tuck's appearance could supposedly pass as resembling a police officer at the time. The plan to kidnap Taylor, which was ironed out over multiple meetings between the defendants, was geared toward bringing Taylor to a location where he would be interrogated about his cocaine stash so Holloway and his accomplices could then steal it. To facilitate this part of the conspiracy, Holloway endeavored to use a warehouse he owned on North 3rd Street in Philadelphia where Taylor's interrogation could occur with assured privacy.

On the evening of August 26, 2006, Co-conspirator #2 told Taylor to meet him at a bar in West Philadelphia and to bring a kilogram of cocaine with him so he could sell it to Co-conspirator #1 and Holloway. Co-conspirator #1 was positioned nearby and watched Taylor from a distance, relaying his location via cellphone to Holloway and the others, some of whom were dressed as police officers, so they could eventually ambush Taylor and execute the kidnapping. When Taylor arrived to the bar, he was accompanied by his girlfriend, Person #1. Co-conspirator #2 directed Taylor and Person #1 to follow him in their car so they could travel to the site where the drug deal would occur. Co-conspirator #2 then led Taylor and Person #1 to a secluded stretch

of road in West Philadelphia where Holloway, Mathis, Scott, Tuck, Co-conspirator #3 and Co-conspirator #4 were waiting. When they arrived, Co-conspirator #2 sped away while Tuck, Co-conspirator #3 and Co-conspirator #4, dressed as police officers and armed with pistols and equipped with police-style strobe lights, effected a traffic stop on Taylor and Person #1.

Taylor and Person #1 were handcuffed and forced into the rear of another vehicle and were eventually driven to Holloway's warehouse in North Philadelphia. During the abduction on the street, Tuck and Person #1 (Taylor's girlfriend) recognized each other – they had been in a romantic relationship several years earlier. But, at the time, both of them kept their recognition of one another to themselves. Upon arrival to the warehouse, Holloway, Scott, Mathis and Co-conspirator #1 led Taylor and Person #1 inside where they were separated from each other. Holloway tortured Taylor as part of the interrogation, burning him with a blowtorch in the process. Taylor told his captors that he kept additional cocaine and some money at his mother's house on Wyalusing Avenue in West Philadelphia. Holloway, Scott and Mathis then held Taylor down and suffocated him to death. The men later dumped Taylor's body in Fairmount Park and released Person #1 in a residential neighborhood near the Park. At the outset of the abduction, Holloway stole the kilogram of cocaine that Taylor brought with him to what he believed would be a drug transaction. Holloway sold the cocaine on the street the next day and divvyed up the proceeds to his co-conspirators.

Soon after, Tuck left town because he feared Person #1 would report his involvement in the kidnapping to police. Person #1 did just that, and Tuck went to New York City to hide out. Tuck stayed in contact with Co-conspirator #1 in the days that followed. Shortly thereafter, Philadelphia Police obtained a warrant for Tuck's arrest and news of his suspected involvement

in the crime was circulated in the local news media. But that was not the only headline during this period.

On August 27, 2006, Taylor's mother's residence in West Philadelphia was raided by two armed men who stole an undisclosed amount of money and drugs while Taylor's mother and sister were home. During the home invasion, Taylor's mother and sister both suffered non-fatal gunshot wounds to their heads. It became apparent to several members of the conspiracy that this home invasion at Taylor's residence was connected to the kidnapping the night before, but the Holloway-sourced members of the conspiracy were not involved. Instead, Wicker, who had been advised by Co-conspirator #2 that Taylor was kidnapped, took it upon himself to outsource the home invasion to two of his accomplices who were not parties to the kidnapping plot, Person #5 and Person #6. Wicker later admitted this to Co-conspirator #2. And, Wicker never distributed any proceeds from the home invasion to the members of the kidnapping conspiracy even though certain members grew suspicious that someone with knowledge of Taylor's kidnapping had stolen their intelligence and burglarized Taylor's house.

At the same time, knowing that Tuck was wanted by Philadelphia Police, Holloway concluded that Tuck was a risk to the members of the conspiracy and sought to have Tuck murdered to prevent him from cooperating with the police when he was arrested. Holloway recruited Person #10 to kill Tuck. On August 31, 2006, Person #10 and unknown accomplices attempted to gun down Tuck in Camden, New Jersey, but Tuck survived and was arrested at a local hospital after being treated for two gunshot wounds to his back. This prompted Holloway and Co-conspirator #1 to pay Tuck's attorney's fees in connection with his prosecution in

Philadelphia County, hoping that payment for costs associated a trial would assure Tuck's silence.

Holloway sought to further cover his tracks. He enlisted the assistance of his former drug trafficking partner, Person #4, who helped Holloway clean the room in the warehouse where Holloway murdered Taylor. Person #4 also loaned Holloway pick axes and shovels to dig the hole where Taylor's body would be eventually buried.[2]  In early September 2006, Holloway, Scott, Co-conspirator #1 and Co-conspirator #3 retrieved Taylor's decomposing body from Fairmount Park and buried it in a vacant lot in North Philadelphia that Holloway had preselected.

Tuck was brought to trial in 2007 and 2008 in Philadelphia County after he was charged with kidnapping Person #1. He was not charged with kidnapping or murdering Taylor because Taylor was still missing at the time of Tuck's local trials. The first trial ended in a hung jury, and Tuck was acquitted at the second trial. During the first trial, Co-conspirator #1 bribed his then-girlfriend, Person #9, to testify falsely on Tuck's behalf about his whereabouts around the time of the kidnapping. That alibi testimony was just as fabricated as the supposed alibi testimony provided by Tuck's mother and sister during the first trial.

The investigation of Taylor went cold after Tuck's second trial ended in 2008. But, in 2013, Person #4 provided details about Holloway's involvement in the murder of Taylor and about other details of their criminal relationship together, to include events of prior drug trafficking, robberies, and murders. In August 2018, Co-conspirator #1, who decided to

---

[2] Person #4 owned a home on West Silver Street in Philadelphia, and in the Summer of 2006 he rented it to Holloway. In 2013, based upon information provided by Person #4, FBI agents recovered several boxes of files from the basement of Person #4's house on West Silver Street. Holloway had since moved out of the house several years earlier. The files in the basement included documents belonging to Holloway, including the property ownership paperwork for the warehouse where Taylor was murdered.

cooperate with the government after he was convicted on state drug trafficking charges, led FBI agents to Taylor's burial site in North Philadelphia. Taylor's remains were unearthed from what is now the parking lot of a charter school, and his skeleton was identified by his dental records.

Co-conspirator #1's cooperation provided corroborating evidence about the 2006 kidnapping as well as the identities of his co-conspirators – Holloway, Scott, Mathis, Wicker, Tuck, Co-conspirator #2 and Co-conspirator #3. Eventually, Co-conspirator #2 agreed to cooperate with investigators, and he too provided insight into the plot's details as well as Wicker's involvement in the planning and the aftermath of the crime, including the home invasion at Taylor's mother's house. Law enforcement also collected and analyzed cellphone records from the dates surrounding and including August 26, 2006, and identified detailed networks of various cellular communications between combinations of Holloway, Scott, Mathis, Tuck, Wicker, Co-conspirator #1, Co-conspirator #2 and Taylor. The defendants were arrested on the indictment in early May 2024.

The government submits the instant motion for rulings on the admissibility of certain evidence to include in its case-in-chief related to: (1) the drug trafficking partnership between Holloway, Scott, Mathis and Co-conspirator #1 that predated, but also existed during, the charged conspiracy; (2) Holloway and Person #4's history of robbing drug dealers together, including two specific robberies in 1999; (3) Holloway's prior drug trafficking partnership with Person #4 and the significant drug debt Holloway owed to Person #4 once Person #4 was released from prison in August 2006; (4) law enforcement's seizure of drug proceeds from Holloway and Mathis at Holloway's residence in August 2005; (5) law enforcement's seizure of drug proceeds in California that had been shipped from Philadelphia and associated with

Holloway's wife's home address; (6) Wicker's prior drug trafficking partnership with Co-conspirator #2 and Taylor and the existence of a drug debt Wicker owed to Taylor; (7) Wicker's prior incarceration with Co-conspirator #2 and Person #6 and their discussions about the home invasion at the Taylor residence while they were incarcerated; and (8) Tuck and Mathis' prior criminal association in Philadelphia.

## III.    SUMMARY OF EVIDENCE SOUGHT TO BE INTRODUCED UNDER RULE 404(b)

At trial, the government will rely, in part, on testimony from Co-conspirator #1, Co-conspirator #2 and Person #4, as well as several law enforcement officers who investigated the offense conduct and other crimes committed by the defendants in the years and months leading up to the charged conspiracy.

### A.    <u>Drug Trafficking Operation – Holloway, Mathis, Scott and Co-conspirator #1</u>

Co-conspirator #1 will testify that beginning in 2004, he distributed cocaine with Holloway and Scott, and that they were supplied by Holloway's brother in California. Holloway would travel to California to arrange the purchase of the cocaine and then ship it to Philadelphia via UPS or DHL courier, while Scott or female companions would ship cash out to California to pay for the cocaine. Co-conspirator #1 will testify that Holloway rented a storefront in York, Pennsylvania, that presented as an art gallery but was really a front, that is, a seemingly legitimate location where Holloway arranged to receive cocaine shipments from California. Co-conspirator #1 and Scott were tasked with fetching the shipments of cocaine from the art gallery when they arrived and transporting the cocaine back to Holloway in Philadelphia. Once this system was up and running, Mathis joined the operation and Holloway directed him to fly to California to arrange for the shipments of cocaine back to Philadelphia. According to Co-

11

conspirator #1, Mathis engaged in a romantic relationship with a woman who worked for the UPS store in California where they had been shipping packages of cocaine to Philadelphia. On one occasion, when a package they were expecting in York did not arrive, Holloway came to realize that Mathis' romantic acquaintance at the UPS store likely stole the package from them. Separately, Person #4 confirmed that Mathis had a hand in losing the package through his relationship with the woman, which had been valued at $300,000. Co-conspirator #1 will testify that Holloway mainly sold all the cocaine in Philadelphia but paid Co-conspirator #1, Mathis and Scott for their assistance with the operation. Person #4 will also testify that Holloway supplied Mathis and Scott with cocaine and that they were all part of the same crew during that period.

**B.  Robberies of Drug Dealers in 1999 – Holloway and Person #4**

Person #4 will testify that he met Holloway in or about 1998, when Person #4 was engaged in a street feud with drug rivals in his neighborhood. According to Person #4, Holloway made his living by robbing drug dealers at the time, and Person #4 committed at least one robbery and an attempted robbery with Holloway in 1999.

**1.  Attempted robbery and murder of Hector Aviles and Jose Angel Ramos**

On the first occasion, in October 1999, Holloway and his associates attempted a robbery in Philadelphia. Person #4 was part of the planning stages of this crime, he served as a lookout, and learned details from Holloway about how the attempted robbery resulted in the murder of two drug dealers in Philadelphia. According to Person #4, Holloway and five other men, including Holloway's brother (Troy) who is now deceased, learned that two Puerto Rican men were in possession of kilograms of cocaine and heroin. Holloway sought to rob them of their drugs. The group conducted surveillance of the men and learned that they routinely visited the

same stash house on a regular basis and drove a white minivan. After learning the drug dealers' habits, the group planned to ambush them by cornering their vehicle near the stash house and staging a traffic dispute to disorient the men before brandishing firearms and stealing their drugs. Once the drugs were stolen, Holloway and his associates planned to resell the drugs on the street and the proceeds would be divvyed up among the conspirators.

On the night of the robbery, Person #4 had been previously injured in an unrelated domestic incident and could not participate in the role that was initially planned for him – to approach the drug dealers at gunpoint during the staged traffic melee. Instead, Person #4 picked up Holloway and drove him to the area of the stash location near Roosevelt Boulevard where the robbery was to occur. When Holloway's other associates were positioned nearby, Person #4 observed Holloway receive a phone call alerting him that the drug dealers were coming their way. At that time, Holloway and his brother and another member of the group ran toward the stash house. Person #4 observed the dealers' white minivan arrive to location, at which time Person #4 departed the area. A short time later, Person #4 encountered another member of their group driving down the street while throwing equipment from his vehicle; according to Person #4, the items were scanning equipment used to monitor police radio frequencies. Person #4 followed the man to a park where he learned that the robbery went sideways and Holloway's brother got shot. The next day, Holloway told Person #4 that the robbery attempt made the news and was reported as a road rage incident. According to Holloway, his brother was shot in the leg by one of the drug dealers and Holloway made fun of his brother for using a "little ass gun" during the robbery, while acknowledging that his brother's gun worked and accurately returned fire at the drug dealers. The attempted robbery did not yield any profits or proceeds for the

conspirators.

Philadelphia Police investigated this crime. On Sunday, October 16, 1999, at approximately 2:37 a.m., police officers responded to the area of 800 Foulkrod Street and encountered Hector Aviles, who was shot multiple times and died on the scene. Shortly after, Jose Angel Ramos arrived to Frankford Hospital where he died from multiple gunshot wounds. Evidence collected on Foulkrod Street included numerous fired cartridge casings of different calibers, including a revolver that was used by Aviles during the shootout. In January 2014, based upon information received from Person #4 and other civilian witnesses, the Philadelphia Police Department cleared the homicide case, determining that the murders were committed by Troy Holloway. No one was ever arrested in connection with this crime. Troy Holloway died on March 11, 2005 from heart complications.

### 2. Robbery of multiple drug traffickers at the "Clubhouse"

Person #4 will testify that around the same time as the double murder of the Puerto Rican drug dealers in 1999, Person #4, Holloway, his brother Troy, and approximately five other men staged a drug deal with men visiting Philadelphia from Virginia and robbed them at gunpoint inside of a place referred to as the "Clubhouse" that was operated by Person #4. According to Person #4, Holloway positioned himself inside the kitchen of the Clubhouse while the drug customers lined up with the intention of purchasing cocaine from Holloway. Person #4 presented himself to the group with a quantity of baking flour, which he pretended was cocaine that he had just bought from Holloway. Person #4's associates who were in on the scheme engaged in the same conduct, posing as if they were there to purchase cocaine, which was really a ruse to convince the out-of-town buyers that Holloway was engaging in actual drug sales in the kitchen.

When Holloway asked one of the men for money, a struggle ensued and Holloway reportedly shot the man. At that time, Person #4's associates held the other drug buyers at gunpoint while Person #4 and another man located the buyers' car parked outside and stole $40,000 from it. According to Person #4, he received $3,500 for his participation in this robbery, and the shooting victim was hospitalized and survived the encounter.

### C. Drug Trafficking Partnership and Debt – Holloway and Person #4

Person #4 will testify that he and Holloway began to sell cocaine together in the Fall of 2003. By that time, Holloway was being supplied with cocaine through a connection in California, and Holloway would send an associate from Philadelphia to California to set up each shipment of cocaine back to Philadelphia. Initially, Person #4 provided Holloway with $16,000 to purchase a kilogram on his behalf; as the operation developed, Person #4 ordered two kilograms every week from Holloway. Eventually, Person #4 helped Holloway cultivate new customers in Philadelphia so Holloway would be in a position to purchase more kilograms with greater frequency from his supplier and maximize profits. According to Person #4, he and Holloway laundered their drug proceeds at casinos in Atlantic City, through a process they called "shrinking down" cash, by which they would gamble with smaller denominations and then cash out from the casinos with larger denominations. Person #4 will testify that on one occasion he observed approximately 20 kilograms of cocaine at Holloway's mother's house.

According to Person #4, between June 2003 and February 2004, he made approximately $175,000 from dealing cocaine with Holloway. In February 2004, Person #4 was charged in this District for possessing a firearm as a felon. Before his arrest, Person #4 left approximately $32,000 with Holloway, with the expectation that Holloway would continue their drug operation

with the source of supply in California, and Holloway would set aside $10,000 per month for

Person #4 and give $1,500 a month to Person #4's wife and mother while he was incarcerated.

After 30 months of incarceration, Person #4 was released from prison on August 4, 2006, and he

expected Holloway to pay him $300,000 upon his release per their arrangement. Around this

time, Holloway had also been renting a house owned by Person #4 on the 2700 block of West

Silver Street in Philadelphia.

Upon Person #4's release from prison, Holloway could not afford to pay Person #4 the

money he was owed. According to Person #4, Holloway said he had lost money in California and

when the police searched his home and seized money from him.[3]  In an effort to repay part of

what he owed to Person #4, Holloway gave him between approximately $20,000-$30,000 and

gifted him a motorcycle.[4]  But, Holloway promised Person #4 that he had something in the works

aimed to repay Person #4. In an effort to make money, Holloway explained that his failings in

the drug business prompted him to revisit his history committing kidnappings, stick up robberies

and home invasions – similar methods that he and Person #4 employed together in the late

1990s.

Person #4 will testify that Holloway admitted to him that he tortured Shamari Taylor and

killed him in a warehouse that Holloway owned at 3209 North 3rd Street in Philadelphia.

According to Person #4, Holloway sought Person #4's assistance with cleaning the room in the

warehouse where Taylor was murdered to remove any evidence of a crime scene; Person #4 will

---

[3] The seizure of money from Holloway's residence is documented in the next section. On August 29, 2005, Philadelphia Police seized $195,826 in cash from Holloway's house on Glenview Street during the execution of a search warrant. At the time of the seizure, both Holloway and Mathis were inside the house.

[4] Co-conspirator #1 will testify that he knew Holloway and Person #4 to be close friends and were engaged in cocaine trafficking together. Co-conspirator #1 also recalled that Holloway gave a motorcycle to Person #4 around the time of Taylor's kidnapping.

testify that they used ammonia during the cleanup. Person #4 also helped Holloway clean out a minivan that was used in Taylor's abduction. Person #4 will testify that Holloway admitted he was nervous about someone involved in the abduction who may cooperate with police, prompting Holloway to move Taylor's body and bury it. To assist Holloway, Person #4 let Holloway borrow pick axes from him to dig the burial plot. According to Person #4, Holloway freely discussed this homicide with him because he trusted Person #4 based upon Person #4's street reputation and the fact that Holloway was financially indebted to him.

### D. Seizure of Drug Proceeds from Holloway's Residence on August 29, 2005

On August 24, 2005, an employee of ADT Alarm Company was hired by Kevin Holloway to install an alarm system at Holloway's house located at 2034 Glenview Street in Philadelphia. While inside the residence, the employee noticed marijuana plants growing inside and he reported what he saw to the Philadelphia Police Department, identifying Kevin Holloway as the homeowner. The next day, law enforcement began conducting surveillance at the residence and observed Holloway as well as his vehicle, a Hummer, parked in the rear. On August 29, 2005, law enforcement conducted surveillance there again and observed Linton Mathis arrive in a white Volvo and walk to the front door of the residence. But, Mathis abruptly departed the location upon noticing law enforcement in the area. Law enforcement thereafter confronted Holloway at the residence and secured a Philadelphia County warrant to search the location. Before doing so, officers noticed a Glock semi-automatic pistol in plain view as well as metal plates in the basement that were recognized as being commonly used to compress kilograms of cocaine. Mathis later returned to the location and was detained by police. Upon executing the search warrant, police officers seized $195,826 in cash, two ballistic vests, and a

loaded 9mm pistol.[5]

Person #4 recalled when this event occurred, as Holloway offered the money seizure from his home as a reason for why Holloway did not have the money to repay Person #4 when he was released from prison.

### E.  Seizure of Drug Proceeds in California on August 25, 2006

On August 25, 2006, one day before Taylor's abduction, law enforcement officers in California seized a UPS parcel containing $101,930 in cash addressed to 1050 South Flower Street in Los Angeles. The intended recipient of the package, T.K., was interviewed about the package and disclaimed ownership of it. During questioning, T.K. provided a prior address of 719 N. 63rd Street in Philadelphia, which was a known address of Kevin Holloway and his wife, N.F. DEA agents investigating Holloway during this period surmised that the money seized in California was shipped on behalf of Holloway as payment for a future shipment of cocaine to Philadelphia.

Person #4 will testify that Holloway offered the excuse that he was losing money in California which was one of several reasons why he did not have the money to repay Person #4 when he was released from prison. Importantly, this large money seizure occurred just one day before Taylor's abduction, underscoring that Holloway sustained losses to his drug business and was still deep into debt with Person #4 right up until Taylor's abduction.

### F.  Drug Trafficking Partnership – Atiba Wicker, Co-conspirator #2 and Shamari Taylor

Co-conspirator #2 will testify that he and Wicker sold cocaine in Philadelphia in or about

---

[5] The affiant for the search warrant is still employed by the Philadelphia Police Department and is on the FBI Drug Task Force; he is able to testify about the details of this investigation and seizure at trial.

2002-2003, and that by 2006, Co-conspirator #2 and Wicker were obtaining cocaine from Shamari Taylor. Co-conspirator #2 and Wicker would then sell their cocaine on the street. According to Co-conspirator #2, Wicker fell into debt with Taylor in 2006 and was unable to repay Taylor for money he borrowed and for cocaine Taylor supplied to Wicker. This debt prompted Wicker to engage in the plot to kidnap Taylor and steal cocaine from him, while aiding the Holloway-sourced conspirators with information about the size of Taylor's cocaine supply. In doing so, Wicker told Holloway and Co-conspirator #1 that Taylor possessed up to 10 kilograms of cocaine, which is what shifted the group's focus from buying cocaine off of Taylor to planning a robbery of Taylor. Wicker participated in the planning stages of the kidnapping, agreeing to funnel information about Taylor's possession of cocaine to Holloway and his associates in advance of the kidnapping and robbery.

### G.  Wicker's Incarceration and Parole Status at the Time of the Kidnapping

In August 2006, Atiba Wicker was on state parole and living in a residential re-entry facility (a "halfway house") in Philadelphia. As a result of a mandated curfew, Wicker was not available to directly participate in the kidnapping of Taylor and Person #1 on August 26, 2006. Nevertheless, Wicker communicated with Co-conspirator #2 via cellphone over the course of the evening and learned details of the crime as it unfolded. During their conversations, Wicker learned that Taylor had been abducted, prompting Wicker to direct Person #5 and Person #6 to commit the home invasion at Taylor's mother's house, knowing that Taylor would not be coming home. According in Co-conspirator #2, Wicker told him that he sent Person #5 to Taylor's mother's residence to commit the home invasion, and that Person #5 shot Taylor's sister because she had seen his face during the robbery. Co-conspirator #2 was familiar with Wicker

and Person #5 because they had all served time together in state prison. Moreover, Co-conspirator #2 and Wicker discussed the shooting of Taylor's mother and sister during the home invasion while they were serving time together in state prison in the years that followed.

Co-conspirator #2 will also testify that, prior to the kidnapping plot, he spoke to Wicker on the phone while Co-conspirator #2 was serving a prison sentence for insurance fraud. Co-conspirator #2 will testify that, at the time, Wicker relayed to him that he and Person #5 had stolen $18,000 and kilograms of cocaine from Taylor's grandmother's house during a burglary, and that during that burglary they had stolen a set of keys to Taylor's mother's residence.

Separately, Co-conspirator #1 will testify that he knew Wicker to be living in a halfway house at the time of Taylor's kidnapping, and that Wicker had been serving as a middleman on behalf of Taylor's drug trafficking operation.

## H.  Prior Criminal Association Between Linton Mathis and Kenneth Tuck

In 1993, Kenneth Tuck and Linton Mathis were indicted by a grand jury in this District for crimes related to an attempted arson in West Philadelphia. They had been arrested as part of an undercover operation by the ATF during which Tuck, Mathis and another man agreed to burn down a building in exchange for money. In connection with that case, both men pled guilty to federal crimes, with Tuck sentenced to 18 months' imprisonment on February 2, 1994, and Mathis sentenced to 36 months' imprisonment on October 28, 1994.

Aside from the ATF investigators, Co-conspirator #1, who is Tuck's cousin, knows the details of the case from Tuck and knows that he and Mathis were arrested for arson. Accordingly, while Co-conspirator #1 recruited Tuck to join the kidnapping plot against Taylor, Tuck was not a complete outsider to the rest of his co-conspirators, as he previously engaged in

criminal conduct with Mathis approximately 13 years before the Taylor abduction.

## IV.    PURPOSE OF ADMITTING THE EVIDENCE

As specified above, the government seeks to offer evidence across eight separate categories, while recognizing that certain evidence in one category may overlap with evidence in another category. For ease of reference, the government offers the following categorical evidence for a proper purpose pursuant to Rule 404(b):

### A.    Category One: Prior Drug Trafficking of Holloway, Scott and Mathis

This evidence will be introduced through Co-conspirator #1 and Person #4, who will testify about their direct knowledge of the association between Holloway, Scott and Mathis in their cocaine trafficking operation as relevant background information and evidence of these defendants' knowledge, intent and plan to join the conspiracy that is the object of Count One of the indictment.

### B.    Category Two: Holloway's History of Robbing Drug Dealers with Person #4

This evidence will be introduced mainly through Person #4, who will testify about his direct knowledge and participation in crimes committed alongside Holloway to rob drug dealers in Philadelphia, as evidence of Holloway's *modus operandi* as well as his knowledge, intent, plan and preparation to join the conspiracy that is the object of Count One and carry out the kidnapping that resulted in Taylor's death that is the object of Count Two. This evidence will also be introduced through Philadelphia Police detectives who investigated the attempted robbery that resulted in the death of Hector Aviles and Jose Angel Ramos on October 16, 1999.

### C.    Category Three: Holloway's Prior Drug Partnership With, and Debt Owed To, Person #4

This evidence will be introduced through Person #4, who will testify about his drug

trafficking partnership with Holloway, including the importation of cocaine from California to Philadelphia between 2003 and 2004, as well as the debt Holloway incurred to Person #4 between 2004 and August 2006. Moreover, Person #4 will testify about Holloway's inability to repay Person #4 when he released from federal prison as a result of Holloway suffering several losses in their drug business. Person #4 will further testify about Holloway's stated intention of reverting back to committing robberies and kidnappings as a way to repay Person #4 to clear his drug debt. This will be offered as evidence of Holloway's motive to engage in the kidnapping conspiracy and commit the kidnapping that resulted in Taylor's death, as charged in Counts One and Two of the indictment, respectively.

### D. Category Four: Money Seizure at Holloway's House and the Arrest of Holloway and Mathis in August 2005

This evidence will be introduced through Police Officer James Cullen, who seized $195,826 from Holloway's residence, and Person #4, who Holloway told about the money seized from his house on Glenview Street on August 29, 2005. This testimony provides evidence of Holloway's motive to commit the charged kidnapping, signifying the substantial losses Holloway sustained in his drug business and his inability to repay Person #4 for the drug debt owed to him. This event also establishes a criminal association between Holloway and Mathis and evinces their relationship in the drug trafficking partnership that is the basis of Category One above. To minimize undue prejudice, the government will not seek to introduce evidence of the nature of the charges against them as a result of their arrest on that date.

### E. Category Five: Money Seizure from Parcel Shipped to Los Angeles in August 2006

This evidence will be introduced through retired DEA agents from the Philadelphia

Division who investigated a UPS package shipped from Philadelphia to Los Angeles that contained $101,930 in cash and was destined to a recipient who provided his former address as the same address shared by Kevin Holloway and his former wife in Philadelphia. Evidence of this event is also familiar to Person #4, to whom Holloway owed a significant drug and offered the excuse that he was losing money in his California drug business which was why he was unable to pay Person #4; hence, the result of this seizure motivated Holloway to engage in the kidnapping of Taylor as means to repay Person #4. Moreover, this event is of temporal significance because this seizure of drug proceeds occurred one day before the defendants kidnapped Taylor and Person #1 in Philadelphia.

### F. **Category Six: Wicker's Drug Trafficking Partnership with Taylor and Co-conspirator #2**

This evidence will be introduced through Co-conspirator #2, who will testify that Taylor supplied him and Wicker with cocaine in the years leading up to the kidnapping, establishing two key purposes: (1) Wicker's knowledge of the scope and size of Taylor's cocaine supply; and (2) Wicker's motive to offer up Taylor as a kidnapping victim in an effort to clear the drug debt he owed to Taylor. Moreover, this evidence will also establish Wicker's continued role in the kidnapping on August 26, 2006, even though he was not physically present, as Wicker maintained contact via cellphone with Co-conspirator #2 throughout the evening to gather information about Taylor's abduction and the likelihood that he would not return home. Once armed with this information, Wicker directed his own accomplices to commit the home invasion at the Taylor residence; indeed, that was the ultimate goal of the conspiracy, but Wicker unilaterally carried out the home invasion without cutting in his co-conspirators once he learned the information Taylor provided to his kidnappers while being tortured.

23

### G. **Category Seven: Wicker's Incarceration and Parole Status**

Co-conspirator #1 and Co-conspirator #2 will testify regarding Atiba Wicker's parole status in August 2006 that required him to abide by a curfew at a halfway house, explaining why he was not present on August 26, 2006 for the kidnapping. Additionally, testimony regarding Wicker's state incarceration after the kidnapping is permissible because Co-conspirator #2 will testify about his discussions with Wicker and Wicker's admissions about his role in the home invasion robbery at Taylor's mother's residence. This evidence will establish Wicker's opportunity to participate in the conspiracy and evinces his knowledge and intent to engage in the offense conduct as demonstrated when he directed that the home invasion be carried out once he learned Taylor was abducted by his co-conspirators.

To minimize undue prejudice, the government does *not* intend to introduce evidence or testimony related to Wicker's underlying crimes of conviction or the nature of any parole violations that precipitated his incarceration.

### H. **Category Eight: Mathis and Tuck's Criminal Association**

Similar to the evidence sought to be introduced in Category Seven, the government does not seek to introduce evidence of the crimes of conviction stemming from Mathis and Tuck's 1993 federal arson case; nor does the government seek to introduce any evidence related to sentencing or any terms of incarceration. Instead, the government seeks limited testimony on the issue of Mathis and Tuck's prior involvement in crimes with one another in Philadelphia to establish their familiarity with one another, the full extent of their relationship, and their shared intent to commit crimes together as evidence of their willingness to join the kidnapping

conspiracy.

* * *

In conclusion, the government seeks to offer all the evidence outlined above for permissible purposes prescribed by Rule 404(b), to include relevant background evidence to provide context to the jury as well as proof of certain defendants' motives to commit the offense conduct charged in Counts One and Two. The evidence will also establish all of the defendants' knowledge, intent, plan, preparation and opportunity to engage in the charged conspiracy and carry out the kidnapping that resulted in Taylor's death. This evidence is squarely within the "permitted uses" provision contained in Rule 404(b), and is necessary and critical to the government's burden in proving each element of the crimes charged beyond a reasonable doubt at trial.

## V.    THE ELEMENTS OF THE OFFENSES CHARGED IN THE INDICTMENT

The evidence summarized above, and specifically detailed in the sections below, is offered in support of the government's burden to prove each of the elements of the crimes charged in the indictment.

### Count One: Conspiracy to commit kidnapping, 18 U.S.C. § 1201(a)(1), (c)

Title 18, United States Code, Section 1201(a)(1) provides, in pertinent part—

Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person . . . when—

(1) . . .   the offender . . . uses . . . any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense— shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

Section 1201(c) provides—

If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life.

In order to find a defendant guilty of conspiracy to commit kidnapping, a crime against the United States, the government must prove each of the following elements beyond a reasonable doubt:

| | |
|---|---|
| First: | That two or more persons agreed to commit a kidnapping; |
| Second: | That a defendant was a party to or member of that agreement; |
| Third: | That a defendant joined the agreement or conspiracy knowing of its objective to commit a kidnapping and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that a defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective, to commit a kidnapping; and |
| Fourth: | That at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.[6] |

### Count Two: Kidnapping resulting in death, and aiding and abetting, 18 U.S.C. §§ 1201(a)(1) and 2

In order to prove a defendant guilty of the crime of kidnapping resulting in death, the government must prove each of the following elements beyond a reasonable doubt:

| | |
|---|---|
| First: | That a defendant seized or confined or inveigled or decoyed or kidnapped or abducted or carried away the victim; |
| Second: | That a defendant held the victim for ransom or reward or for any other reason; |
| Third: | That a defendant used the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense; |

---

[6] *See* Third Circuit Model Criminal Jury Instruction, No. 6.18.371A (2018).

Fourth:        That a defendant acted unlawfully, knowingly, and willfully; and

Fifth:          That a defendant's acts resulted in the death of the victim.[7]

In order to find the defendant guilty of kidnapping resulting in death, because he aided and abetted the principal in committing this offense, the government must prove the following four requirements:

First:          That the principal committed the offense charged, that is, kidnapping, by committing each of the elements of the offense described above;

Second:     That a defendant knew that the offense charged was going to be committed or was being committed by the principal;

Third:        That the defendant knowingly did some act for the purpose of assisting the principal in committing the offense charged and with the intent that the principal commit that specific offense; and

Fourth:        That the defendant performed an act in furtherance of the offense charged.[8]

\* \* \*

The evidence establishes the existence of undeniable patterns. For instance, Holloway and Wicker were both motivated to engage in the kidnapping of Taylor to settle drug debts, while Holloway's *modus operandi* was to commit violent robberies of drug traffickers just as he and his co-conspirators carried out in this case. Moreover, Holloway, Scott and Mathis all shared a common goal to carry on their drug trafficking operation with one another, and the kidnapping helped them to facilitate the completion of that goal. Meanwhile, Wicker's planning of the crime and involvement in the conspiracy was demonstrated by statements he made to, and information

---

[7] *See* Modern Federal Jury Instructions-Criminal, Instruction 42-1 and 42-2 (2021). *See also United States v. Toledo*, 985 F.2d 1462, 1465 (10th Cir. 1993).

[8] *See* Third Circuit Model Jury Instructions (Criminal) 7.02.

he learned from, Co-conspirator #2 while Wicker was either incarcerated or confined to the halfway house. And, Tuck and Mathis, through their previous criminal association, had the opportunity to reconnect as trusted co-conspirators alongside the other defendants and cooperating witnesses. Accordingly, the evidence offered under each category is admissible and offered to a proper purpose, subject to appropriate limiting instructions, pursuant to Rule 404(b).

## VI.    ARGUMENT

### A.  **Rule 404(b) and Guiding Principles**

Under Federal Rule of Evidence 404(b), the court may admit evidence of an uncharged "crime, wrong, or other act" in certain circumstances. Federal Rule of Evidence 404(b) states:

(b) Crimes, Wrongs, or Other Acts.

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

(A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

(B) do so before trial -- or during trial if the court, for good cause, excuses lack of pretrial notice

[Emphasis added.]

Rule 404(b) applies to evidence of wrongful acts that are "extrinsic" to the charged offense. The Rule provides that while evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show conformity therewith, such evidence may be used for other purposes; indeed, such evidence shall be admitted if relevant for any other purpose

than to show a mere propensity or disposition on the part of the defendant to commit the crime. *See United States v. Long*, 574 F.2d 761, 765 (3d Cir. 1978), *cert. denied*, 439 U.S. 985 (1978). "In *Huddleston v. United States*, 485 U.S. 681 (1988), the Supreme Court set out a four part test for admission of Rule 404(b) evidence: (1) the evidence must have a proper purpose; (2) it must be relevant; (3) its probative value must outweigh its potential for unfair prejudice; and (4) the court must charge the jury to consider the evidence only for the limited purposes for which it is admitted." *United States v. Givan*, 320 F.3d 452, 460 (3d Cir. 2003). Further, Rule 404(b) makes no distinction between acts prior to and subsequent to the charged conduct. *See United States v. Bergrin*, 682 F.3d 261, 281 n.25 (3d Cir. 2012).

The essential limitation is that the evidence must not simply show propensity, that is, that the defendant committed a crime before and therefore must have done so again. Therefore, the proponent of evidence of prior acts "must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged." *United States v. Morley*, 199 F.3d 129, 133 (3d Cir. 1999); *United States v. Himelwright*, 42 F.3d 777, 782 (3d Cir. 1994).

Thus, Rule 404(b) was designed to set forth "a general rule of admissibility, subject to a single exception – evidence of other wrongful acts was admissible so long as it was not introduced *solely* to prove criminal propensity. Thus, the proponent no longer had to pigeonhole his evidence into one of the established common-law exceptions, on pain of exclusion. If he could identify *any* non-propensity purpose for introducing the evidence, it was admissible." *United States v. Green*, 617 F.3d 233, 244 (3d Cir. 2010) (emphasis in original). *See also United States v. Repak,* 852 F.3d 230, 241 (3d Cir. 2017) ("In sum, Rule 404(b) is a rule of exclusion,

meaning that it excludes evidence unless the proponent can demonstrate its admissibility, but it is also 'inclusive' in that it does not limit the non-propensity purposes for which evidence can be admitted.").

The Third Circuit has spoken favorably of Rule 404(b) evidence on many occasions. One panel stated:

> We favor the admission of such evidence, "if relevant for any other purpose than to show a mere propensity or disposition on the part of the defendant to commit the crime." *United States v. Long*, 574 F.2d 761, 766 (3d Cir.1978); *see also United States v. Simmons*, 679 F.2d 1042, 1050 (3d Cir.1982). . . . "In weighing the probative value of evidence against the dangers . . . in Rule 403, the general rule is that the balance should be struck in favor of admission." *United States v. Dennis*, 625 F.2d 782, 797 (8th Cir. 1980).

*United States v. Johnson*, 199 F.3d 123, 128 (3d Cir. 1999). *See also United States v. DeMuro*, 677 F.3d 550, 563 (3d Cir. 2012) (Rule 404(b) "is inclusive, not exclusive, and emphasizes admissibility.") *(quoting United States v. Sampson,* 980 F.2d 883, 886 (1992)); *United States v. Daraio*, 445 F.3d 253, 263 (3d Cir. 2006) (confirming that admission of 404(b) evidence is favored); *cf. United States v. Caldwell,* 760 F.3d 267, 276 (3d Cir. 2014) (noting this "does not suggest that prior offense evidence is presumptively admissible."). The Supreme Court is aligned with the Third Circuit's view, stating: "Congress was not so nearly concerned with the potential prejudicial effect of Rule 404(b) evidence as it was with ensuring that restriction would not be placed on the admission of such evidence." *Huddleston v. United States*, 485 U.S. 681, 688-89 (1988).[9]

---

[9] Every Circuit, consistent with *Huddleston* and statements of the Third Circuit described above, has endorsed this view regarding the admissibility of Rule 404(b) evidence. *See, e.g., United States v. Cassiere*, 4 F.3d 1006, 1021 (1st Cir. 1993) ("Rule 404(b) 'is one of inclusion which allows the introduction of evidence of other crimes, wrongs, or acts unless the evidence tends to only prove criminal disposition.'") (citation omitted); *United States v. Ortiz*, 857 F.2d 900, 903 (2d Cir. 1988) ("Under the 'inclusionary' or 'positive' approach to other acts evidence that controls in this Circuit, other acts or crimes are admissible under Rule 404(b) to prove matters other than the defendant's criminal propensity."); *United States v. Briley*, 770 F.3d 267, 275 (4th Cir. 2014) ("As we have

### B. **All Eight Categories of Evidence are Admissible Under Rule 404(b).**

As a general matter, the Third Circuit has instructed that the District Court "should not merely inquire of the prosecution what it wishes the evidence to prove" but rather put the government to the task of explaining how the evidence "should work in the mind of a juror to establish the fact the government claims to be trying to prove." *Repak*, 852 F.3d at 244 (citing *Caldwell*, 760 F.3d at 282 (internal quotation marks and citations omitted)). As a matter of record, to date none of the defendants have proffered a defense. However, the nature of the charges and the specificity of the pleadings in the indictment lend itself to the prospect that the unified defense will be that none of the defendants participated in the conspiracy, had no knowledge of Taylor's abduction when it happened, and the government's cooperating witnesses have all framed the defendants and lied to secure themselves more favorable treatment in their prosecutions. Accordingly, all of the evidence the government seeks to introduce is probative of the defendants' involvement in the kidnapping; more specifically, the identity of each defendant will likely be an issue of great dispute and the proffered evidence undeniably establishes not just

---

long maintained, the Rule's inclusive nature militates toward 'admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition.'") (citations omitted); *United States v. King*, 703 F.2d 119, 125 (5th Cir. 1983) ("This test takes an inclusionary and not an exclusionary approach."); *United States v. LaVictor*, 848 F.3d 428, 446 (6th Cir. 2017) ("Rule 404(b) is 'a rule of inclusion rather than exclusion.'") (citation omitted); *United States v. Jordan*, 722 F.2d 353, 356 (7th Cir. 1983) (relying on the Third Circuit's decision in *Long* to emphasize that the rule is one of inclusion, which emphasizes the admissibility of "other crimes" evidence); *United States v. Contreras*, 816 F.3d 502, 511 (8th Cir. 2016) (the rule is "one of inclusion, such that evidence offered for permissible purposes is presumed admissible absent a contrary determination."); *United States v. Bailey*, 696 F.3d 794, 806 (9th Cir. 2012) ("Rule 404(b) has thus long been characterized as 'a rule of inclusion—not exclusion.' . . . Indeed '[u]nless the evidence of other acts *only* tends to prove propensity, it is admissible.'") (emphasis in original; citations omitted); *United States v. Burgess*, 576 F.3d 1078, 1098 (10th Cir. 2009) ("Rule 404(b) is considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition.") (emphasis in original; citation omitted); *United States v. Smith*, 741 F.3d 1211, 1225 (11th Cir. 2013) ("Rule 404(b) is a rule of inclusion, and '404(b) evidence, like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case.'") (citation omitted); *United States v. Douglas*, 482 F.3d 591 (D.C. Cir. 2007) ("'Rule 404(b) is not so much a character rule as a special aspect of relevance' because it 'does not prohibit character evidence generally, only that which lacks *any* purpose but proving character.'") (emphasis in original; citation omitted).

that each defendant participated in the conspiracy but that they had the motive to kidnap Taylor and the opportunity to do so with the requisite intent to commit the charged crimes. Rule 404(b) invites this type of evidence under these circumstances.

The indictment charges the defendants in Count One with a conspiracy to kidnap Shamari Taylor, and the stated objective of the conspiracy was to rob Taylor for cocaine and abduct him for interrogation to ascertain where he stored additional cocaine and drug proceeds. Each defendant is charged with maintaining a different role in the conspiracy but sharing a unity of purpose to accomplish the objective of the conspiracy. The violent measures planned and carried out by the defendants and their other co-conspirators created an obvious risk of death to Taylor and concluded with Taylor's murder which was thereafter covered up for approximately 12 years. The defendants' past criminal ventures with one another and with other individuals provide clear insight into how and why the kidnapping plot was developed, planned, prepared, and executed.

Count Two of the indictment charges the defendants with carrying out, and aiding and abetting, the kidnapping of Taylor in the evening hours of August 26 and the early morning hours of August 27, 2006. Similarly, the defendants' past criminal ventures – to include drug trafficking and certain acts of violence – establish their knowledge and intent to engage in the crime, both of which are elements that the government must prove. Accordingly, Rule 404(b) provides a lawful basis of admissibility for the eight categories of evidence.

Finally, all of the categories provide relevant background information for the jury to understand the context of why all of the defendants engaged in the offense conduct and the nature of their relationships that were all based upon criminal partnerships, making those

partnerships probative of their willingness to engage in the kidnapping of Taylor. This evidence is permissible for that purpose. *See Green*, 617 F.3d at 250 (supplying helpful background information to the finder of fact is a proper purpose under Rule 404(b)); *United States v. O'Leary*, 739 F.2d 135, 136 (3d Cir. 1984) (identifying the need to "show the background of the charges [and] the parties' familiarity with each other" is a proper purpose); *United States v. Simmons*, 679 F.2d 1042, 1050 (3d Cir. 1982) (same).

> **1. Category One: Holloway, Mathis and Scott's partnership in cocaine trafficking between 2005 and August 2006 is probative and necessary to establish the nature of their relationship and prove their shared intent, knowledge, and plan in joining the conspiracy as charged in Count One and carrying out the kidnapping as charged in Count Two.**

With respect to Count One, the government must prove the defendants agreed to commit a kidnapping and that during the conspiracy at least one member performed an overt act to further the conspiracy's objective. For Count Two, the government must prove that a defendant abducted Taylor for reward and acted knowingly and willfully when doing so, or aided and abetted another defendant in committing the abduction for the same purpose. As is clear from the indictment, the government's theory is that the defendants entered into an agreement with other co-conspirators to rob Taylor, who they knew was a drug dealer, for the purpose of stealing cocaine and drug proceeds in his possession and from a location he controlled.

With the exception of Tuck, all of the defendants were drug dealers who sought to obtain cocaine by means of kidnapping and robbery so they could eventually sell the cocaine that they stole. Co-conspirator #1's proposed testimony will cover how he knows Holloway, Mathis and Scott and why they agreed to kidnap Taylor. This would include (1) the history of their relationship that entailed Holloway leading a cross-country drug trafficking operation and

33

employing Co-conspirator #1, Mathis and Scott to be his partners who were tasked with coordinating the receipt of drug shipments and retrieving cocaine when it arrived from California, (2) their collective awareness that their drug business was failing in August 2006, which was based upon the accumulation of losses sustained from law enforcement seizures or theft, and (3) their willingness to engage in dangerous, risky, and brazen crime together. Each of these topics are not offered to improperly establish the defendants' propensity to commit the crimes charged; instead, they are offered to explain the circumstances surrounding how and why they sought to engage in the plot to kidnap Taylor. These defendants were partners in an illegal drug business, business was bad, Taylor's seemingly extensive cocaine supply provided an opportunity for them to get back on track, and they took measures to use Taylor as a solution to their troubles by kidnapping and robbing him. No link in this chain involves an inference of propensity. Instead, the facts explain the defendants' intent to join the conspiracy and execute their collective plan because they had prior experience working together in their drug partnership.

Such evidence also shows the relationship and connection between Co-conspirator #1, Holloway, Mathis and Scott and provides relevant background for the jury as to how they were familiar with one another, how they built a relationship through criminal activity, and why they agreed to joined the conspiracy. Without this testimony, the trial evidence would simply focus on Taylor's abduction, yet there is much more historical information about the conspirators' relationships that explains why they would go so far as to kidnap and kill Taylor. The jury is entitled to know the extent of their prior relationship.

An additional unenumerated yet permissible purpose for admitting evidence under Rule

404(b) is to "demonstrate a continuing relationship between an unindicted co-conspirator and the defendant . . . ." *United States v. Scarfo,* 850 F.2d 1015, 1019 (3d Cir.1988); *see also United States v. O'Leary,* 739 F.2d 135, 136 (3d Cir.1984) (evidence properly admitted to show, *inter alia*, the parties' familiarity with one another, and their coordinated action). Indeed, the Third Circuit has traditionally held that extrinsic evidence of prior criminal activity is admissible under Rule 404(b) to show the relationship between a witness and a defendant. *See, e.g.*, *United States v. Butch*, 256 F.3d 171 (3d Cir. 2001) (allowing witness in pharmaceutical theft case to testify as to defendant's prior participation in identical theft); *see also United States v. Simmons*, 679 F.2d 1042, 1050 (3d Cir. 1982), *cert. denied*, 462 U.S. 1134 (1983) (holding that evidence may be introduced "to provide necessary background information, to show an ongoing relationship between [the defendant and a co-conspirator], and to help the jury understand the co-conspirator's role in the scheme").

To that end, Rule 404(b) evidence may be offered to show the pertinent background of the offenses and to establish the relationship among the offenders. The Third Circuit in *Butch* reaffirmed the principle that 404(b) evidence may be introduced "to provide necessary background information, to show an ongoing relationship between [the defendant and an accomplice or co-conspirator], and to help the jury understand the co-conspirator's role in the scheme." 256 F.3d at 176 (citing *Simmons*, 679 F.2d at 1050). *See also Green*, 617 F.3d at 247 ("[A]llowing the jury to understand the circumstances surrounding the charged crime – completing the story – is a proper, non-propensity purpose under Rule 404(b)."). Indeed, evidence is, and has been, admissible under Rule 404(b) to show a relationship and criminal association between individuals. *See, e.g.*, *United States v. Mathis*, 264 F.3d 321 (3d Cir. 2001)

(affirming decision that evidence of uncharged robberies was properly admitted to show witness' familiarity with the defendant and the manner in which they committed robberies).

In *United States v. Lane*, 342 Fed. Appx. 825 (3d Cir. 2009), the Third Circuit affirmed the district court's ruling to admit testimony about a prior robbery as it was necessary to establish the ongoing relationship of the defendant with his co-defendant, the government's witness. The Court acknowledged that the testimony explained why the defendant and the co-defendant trusted each other and were able to accomplish the robbery in question without significant planning. *See id.* at 827. The evidence was "therefore relevant to establishing preparation and plan which are appropriate uses of evidence of a defendant's prior 'bad acts' under Rule 404(b). Moreover, such testimony was the only way the government could establish the relationship between [the defendant] and the co-defendant, and that was certainly relevant to the government's case." *Id.* Accordingly, the Court held that the district court correctly found that a "genuine need" for the evidence outweighed any prejudicial effect. *See id.* The same logic applies here; by establishing that the defendants were closely engaged in drug trafficking before and during the kidnapping conspiracy, the government can highlight their ongoing relationship such that the trust reposed between the defendants explains why they ventured to undertake a kidnapping plot. Again, this is important context for the jury to consider. *See Green,* 617 F.3d at 249 ("[O]ne proper purpose under Rule 404(b) is supplying helpful background information to the finder of fact.").

Rule 404(b) evidence may also be offered to bolster the credibility of a witness. For example, as in *Butch*, evidence of a prior criminal relationship between a witness and the defendant will be pertinent to explain why the witness was trusted and became privy to the

matters regarding which he is testifying. Similarly, in *Green*, the Court stated, "evidence concerning a witness's credibility is always relevant, because credibility is always at issue, . . . especially when the witness is testifying for the government in a criminal trial." *Id.* at 251. Here, without any background information or context of their relationship, the jury will be forced to speculate as to how and why Taylor was kidnapped by a group of men, all of whom will undoubtedly deny their involvement in the crime or association with one another. Co-conspirator #1's testimony will bridge that gap. And, if the jury were permitted to understand that Co-conspirator #1, Holloway, Mathis and Scott had a relationship that spanned over a year prior, including a cross-country cocaine trafficking operation, the jury would understand why these men assembled to plan and carry out Taylor's kidnapping. On that basis alone – avoiding jury confusion regarding the parties' background – the evidence is of great relevance and is admissible under Rule 404(b). *See Green*, 617 F.3d at 250 ("[O]ne proper purpose under Rule 404(b) is supplying helpful background information to the finder of fact. Here, evidence of [defendant's] threat was admissible as background information which completed the story of the crime. It explained why [the defendant] was under investigation, why [the witness] agreed to serve as an informant, and the references to [the victim] in their conversations.").

The Third Circuit has also permitted evidence of uncharged crimes when a co-conspirator offers testimony about his past criminal relationship with a defendant as proof of their joint participation in a conspiracy. In *United States v. Mathis* (no relation to the defendant in this case), the defendant was convicted of bank robbery and conspiracy to commit the same, and one of his co-conspirators testified against him about eleven uncharged bank robberies they

committed together. In upholding the district court's admission of this evidence, the Third

Circuit held:

> Mr. Mathis was indicted for a conspiracy, whose details the government was required to prove, and [coconspirator] was the government's only witness who could describe the conspiracy directly. [Co-conspirator's] testimony regarding the eleven uncharged robberies, if believed by the jury, explained both [co-conspirator's] role in the conspiracy and his motive for testifying, i.e., to fulfill his plea agreement and reduce his sentence. This testimony also tended to show that, in addition to their previous associations, [co-conspirator] and Mr. Mathis conspired in robbing [the bank], on the theory that co-conspirators more often trust those with whom they are already intimate. *Mathis*, 264 F.3d at 328.

As part of his cooperation plea agreement, Co-conspirator #1 pled guilty to the crime of

kidnapping resulting in death, and he admitted committing the crime alongside Holloway, Mathis

and Scott (and Tuck, Wicker, and Co-conspirator #2). As summarized above, evidence of the

nature of Co-conspirator #1's relationship with Holloway, Mathis and Scott – even though it

involved uncharged drug trafficking activity – is therefore relevant and permissible under Rule

404(b). *See United States v. Vega*, 285 F.3d 256, 261-64 (3d Cir. 2002) (holding that evidence of

involvement in prior drug conspiracy was admissible to prove defendant's knowledge of later

conspiracy and his relationship with a co-conspirator); *United States v. Kirkland*, 612 F. App'x

133, 136 (3d Cir. 2015) ([T]he reference to prior burglaries were admissible for a non-propensity

purpose, *see* Fed.R.Evid. 404(b)(2), that is, establishing Lawton's relationship with Kirkland and

demonstrating Lawton's credibility to testify as to the conspirators' methods and Kirkland's role

in the conspiracy.").

    **2. Category Two: Holloway's history of robbing drug dealers with Person #4 in 1999 is probative of his *modus operandi* as well as his knowledge, intent and plan to join the conspiracy charged in Count One and carry out the kidnapping charged in Count Two.**

Holloway and his co-conspirators kidnapped and robbed a drug dealer, and the purpose of the kidnapping was to find out where additional drugs were stored so they could be stolen. Holloway and Person #4 had committed similar crimes in the past, and Holloway admitted to Person #4 that he intended engage in a violent crime in order to pay back Person #4. He thereafter went on to commit the offense conduct. Evidence regarding Holloway's prior robberies of drug dealers is probative of his intent and plan to join the charged conspiracy and evinces his *modus operandi*, that is, his penchant for robbing drug dealers; indeed, as described by Person #4, Holloway's prior robberies of drug dealers demonstrated advance planning and surveillance, the use of multiple accomplices, the use of firearms, and some form of subterfuge or ruse to confuse the victim. These same robbery features existed in the conspiracy charged in Count One. Evidence of Holloway's prior crimes is relevant and permissible.

When determining whether *modus operandi* is a permissible basis for inclusion under Rule 404(b), the district court "'may look at all of the similarities together and determine whether a pattern has been established.'" *United States v. Taylor*, 379 F. App'x 240, 243 (3d Cir. 2010) (admitting evidence of methods deployed in robberies from 1998 as they were so similar to the methods used in the 2005-06 robberies that they established a *modus operandi* to establish defendant's identity as one of the participants in the 2005-06 robberies) (quoting *United States v. Carlton*, 534 F.3d 97, 101-02 (2d Cir. 2008)). Here, Holloway's prior involvement in two robberies of drug dealers explains how he developed his *modus operandi* for the current conspiracy to rob and kidnap Taylor; indeed, the conspiracy to kidnap Taylor involved advance planning over the course of multiple meetings, numerous accomplices with different roles, the use of firearms, and a ruse that included co-conspirators disguising themselves as police officers

to effect a traffic stop on Taylor. The two earlier robberies both targeted cocaine dealers, like Taylor, and they involved numerous armed men and ruses like a staged traffic dispute and a fugazi drug transaction with baking flour as a prop. The Third Circuit has held that similar evidence under these circumstances is admissible. *See United States v. Kirkland*, 612 F. App'x 133, 136 (3d Cir. 2015) ("[T]he prior burglaries showed how and why Kirkland and Lawton developed their *modus operandi* for their current conspiracy; demonstrated that they had the skill and knowledge to commit the charged burglaries; and explained why they were able to lead the conspiracy and recruit others."). And, the Tenth Circuit has held similarly. *See, e.g.*, *United States v. Record*, 873 F.2d 1363, 1375 (10th Cir. 1989) (noting the relevance of evidence showing a distinctive "method"); *United States v. Gutierrez*, 696 F.2d 753, 755 (10th Cir. 1982) (concluding that an alleged "other crime" had a signature quality where, in both cases, the get-away driver used her children as cover); *United States v. Shumway*, 112 F.3d 1413, 1420 (10th Cir. 1997) (admitting evidence of thefts occurred at the same remote address and required specialized skill); *United States v. Brooks*, 2024 WL 3899032, at *8 (D. Kan. Aug. 22, 2024) (holding admissible evidence of *modus operandi* when defendant's signature approach involved method of identifying vulnerable teenage girls of a certain age and ethnicity and then exploit them through means such as isolating the victim in a secluded area or room); *United States v. LaFlora*, 146 F. App'x 973, 975 (10th Cir. 2005) (permitting bank robberies that involved the same series of acts each time, such as leaving one robber to guard the lobby).

  As mentioned above, it is entirely foreseeable that Holloway's defense will be that he was not a criminal associate of Person #4, was not party to the kidnapping conspiracy, and had no involvement in the crime whatsoever. Person #4's participation in similar robberies of drug

dealers with Holloway is probative of Holloway's identity and role in the plot to kidnap and rob Taylor of cocaine, as the methods employed during the crime are similar in nature to the methods Holloway used when he robbed other drug dealers with Person #4. It is important to note, again, that Person #4 will testify that Holloway told him before Taylor's kidnapping that he had something in the works that resembled the prior robberies and stick ups that Person #4 knew Holloway to commit. Accordingly, this evidence should be held admissible.

> **3. Category Three: Holloway's cocaine trafficking partnership with Person #4, and the debt that Holloway amassed as a result of that partnership, is probative and necessary to establish his motive to join the conspiracy charged in Count One and carry out the kidnapping charged in Count Two.**

Holloway fell into debt when his cocaine trafficking operation sputtered between August 2005 and August 2006. As a result, he owed $300,000 to Person #4, a formidable drug trafficker who Holloway knew was prone to acts of violence, as he had previously committed violent crimes alongside Person #4. Holloway was motivated to make quick money in August 2006, when Person #4 was released from prison and looking for repayment from Holloway. This predicament prompted Holloway to gather his co-conspirators and plot the kidnapping and robbery of Taylor, which he believed, based on the intelligence provided by Atiba Wicker, would result in a significant score – the taking of up to 10 kilograms of cocaine. Evidence of Holloway's debt to Person #4 and his necessity to pay that debt was Holloway's motive to commit the crimes charged in Counts One and Two.

Motive has been defined as "the reason that nudges the will and prods the mind to indulge the criminal intent." *United States v. Beechum*, 582 F.2d 898, 915 (5th Cir. 1978). It is generally proper to admit evidence that proves motive to commit a crime. *United States v.*

*Willoughby*, 860 F.2d 15, 24 (2d Cir.1988); *United States v. Pedroza*, 750 F.2d 187, 200 (2d Cir. 1984); *United States v. Sriyuth,* 98 F.3d 739, 747 n. 12 (3d Cir.1996) (holding that motive is a proper purpose and declining to determine whether statute at bar required proof of motive or purpose "[b]ecause motive is always relevant in a criminal case"). "While Rule 404(b) prohibits evidence of bad acts simply to show bad character, it does allow evidence of bad acts to prove such things as motive[.]" *United States v. McKinney*, 954 F.2d 471, 480 (7th Cir. 1992) (holding that evidence about the victim having botched a drug transaction with defendant was admissible in prosecution for conspiracy to commit murder to establish defendant's motive for killing victim and was not inadmissible prior bad act evidence, although transaction occurred 20 months before victim's murder). The Third Circuit Model Jury Instructions acknowledge motive as a necessary consideration for jurors during deliberation:

> Intent and motive are different concepts. Motive is what prompts a person to act. Intent refers only to the state of mind with which the particular act is done. Personal advancement and financial gain, for example, are motives for much of human conduct. However, these motives may prompt one person to intentionally do something perfectly acceptable while prompting another person to intentionally do an act that is a crime.

[3d Cir. Model Jury Instruction (Criminal) 5.04.]

Holloway's motive is important, not only for the jury to understand what was going on contextually in August 2006, but also for why Holloway acted. Holloway's debt is necessary to complete the story of the crimes charged, and it is dually probative to explain what drove him to kidnap Taylor. Rule 404(b) encourages admission of this evidence. For instance, in *United States v. Pedroza*, the Second Circuit held that a defendant's participation in uncharged drug transactions was admissible to establish the defendant's motive for kidnapping. 750 F.2d 187, 200-01 (2d Cir. 1984). The Court also upheld the district court's finding that the probative value

of such evidence outweighed its prejudicial effect. *Id.* ("Thus, we would agree with the trial court that some detail as to the events involving the cocaine was necessary to the jury's understanding of, for example, whether a kidnaping was intended, why a kidnaping might have been thought desirable, and why the person abducted was Luis. Given the district court's view that the jury would be unable to understand the government's theory of the case without evidence of the cocaine transaction, its decision to admit that evidence was not improper."). *See also United States v. Pacheco*, 902 F. Supp. 469, 474 (S.D.N.Y. 1995) (evidence of uncharged narcotics conspiracy admissible to prove motive for charged kidnapping); *United States v. Frank*, 11 F. Supp. 2d 314, 317 (S.D.N.Y. 1998) (Evidence of Frank's narcotics dealings, and Price's knowledge of them, also is admissible to complete the story of the crimes charged. Without this information, the jury would be "unable to understand the government's theory of the case.") (quoting *Pedroza,* 750 F.2d at 201).

Under similar circumstances, numerous other courts have upheld the admission of evidence of prior crimes involving drug trafficking as a means to establish that a defendant committed a more serious crime. *See, e.g.*, *United States v. Talley*, 164 F.3d 989, 999 (6th Cir. 1999) (permitting testimony that the defendant and informant had previously sold drugs together and that the informant had additional information about illegal activity in which the defendant was involved because it proved defendant's motive to commit a murder-for-hire and pertained to the underlying charges); *United States v. Bitterman*, 320 F.3d 723, 727 (7th Cir. 2003) (affirming admission of evidence of defendant's heroin use and addiction as relevant to establish his motive to commit robbery); *United States v. Brooks*, 125 F.3d 484, 499-501 (7th Cir. 1997) (holding that the district court properly admitted evidence that defendants used crack cocaine because "[e]ven

though the drug use and the crime at issue [robbery] admittedly are not similar, they have a significant relationship because the act is the motive underlying the crime of bank robbery"); *United States v. Miranda*, 986 F.2d 1283, 1285 (9th Cir. 1992) (upholding the admission of evidence of defendant's $20 to $30 a day heroin habit to demonstrate motive to rob); *United States v. Kadough*, 768 F.2d 20 (1st Cir. 1985) (holding that district court properly admitted testimony regarding the defendant's involvement with cocaine to establish motive to import heroin).

Moreover, a defendant's debt or financial needs can be properly admitted to provide context to the jury and establish a defendant's motive to commit a crime. *See, e.g.*, *United States v. Morant*, 98 Fed. Appx. 560, 564 (7th Cir. 2004) (gambling losses admissible to prove motive for bank robbery); *United States v. Kimball*, 73 F.3d 269, 272 (10th Cir. 1995) ("[Defendant's] available cash and prospective means of support was relevant to motive."); *United States v. Thompson*, 2007 WL 756712, at *4 (N.D. Okla. Mar. 8, 2007) ("Evidence concerning defendant's alleged use, possession, and sale of narcotics is admissible to the extent that the United States attempts to show financial need and motive to rob the banks. In that case, the evidence is properly admitted to show defendant's motive under Rule 404(b)"). *United States v. Candelaria*, 2024 WL 727708, at *3 (D.N.M. Feb. 22, 2024) ("[T]his Court finds evidence of Defendant's debt history preceding the charged crimes is admissible as it is inextricably intertwined with, integral to, and necessary for the jury to understand the evidence related to the bank robbery and bank fraud charges. While debt itself is not an integral part of or intrinsic to the crimes charged, losses and debts as they pertain to proving a defendant's motive where the question is cash flow is relevant, have an extensive record of being admissible as res gestae.")

44

Holloway's failing drug business and his significant debt to a violent drug dealer motivated him to plan and carry out Taylor's kidnapping. The jury is entitled to hear evidence of this predicament to understand why Holloway acted and what prompted his role in the kidnapping. This evidence is admissible and no link in the chain of inferences involves propensity. *See Pacheco*, 902 F. Supp. at 474 ("I find that evidence of the underlying narcotics conspiracy is necessary if the jury is to have any understanding of what this case is about and why the kidnapping occurred. Such probative value outweighs any prejudice that defendants may suffer simply because the evidence relates to drug activity. Accordingly, evidence of the underlying narcotics conspiracy is admissible.").

> **4.  Category Four: The August 2005 money seizure from Holloway's house is probative and necessary to establish Holloway and Mathis' motive to join the conspiracy charged in Count One and carry out the kidnapping charged in Count Two.**

Holloway and Mathis were arrested at Holloway's house in Philadelphia in August 2005, and law enforcement executed a warrant there that resulted in the seizure of nearly $200,000 in cash. This occasion marked one of several significant losses to Holloway's drug operation and was a link in a chain of events that led to the massive drug debt Holloway owed to Person #4, motivating Holloway to kidnap Taylor to make quick money. Person #4 recalled when this event occurred, as Holloway offered the money seizure from his home as a reason for why Holloway did not have the money to repay Person #4 when he was released from prison.

For similar reasons articulated above in Category Three, this evidence should be admissible as establishing facts in support of Holloway's motivation to carry out Taylor's kidnapping. Because Holloway and Mathis were both drug trafficking associates and shared profits, Holloway's motivation to repay Person #4 and reestablish his drug business was dually

shared by Mathis. Indeed, Mathis was present at the time of the money seizure at Holloway's house; therefore, the seizure affected them both as they were both in business together. This event directly signifies Holloway's debt and a strike to the business he shared with Mathis, thus is it admissible evidence of their motive to commit Counts One and Two. *See Pedroza*, 750 F.2d at 201 (holding that "some detail as to the events involving the [uncharged] cocaine was necessary to the jury's understanding of, for example, whether a kidnaping was intended, why a kidnaping might have been thought desirable, and why the person abducted was [victim]"); *McKinney*, 954 F.2d at 480 (holding that evidence about the victim having botched a drug transaction with defendant was admissible in prosecution for conspiracy to commit murder to establish defendant's motive for killing victim and was not inadmissible prior bad act evidence, although transaction occurred 20 months before victim's murder); *United States v. Wood*, 2016 WL 6680956, at *8-9 (D. Kan. Nov. 14, 2016) (admitting evidence of defendant's dire financial circumstances, noting "Defendant found it more difficult to operate her businesses as her financial situation deteriorated. This, the Government posits, was Defendant's motive for engaging in the [charged] conduct . . . to fraudulently open new bank accounts, and to check kite in those new accounts. . . . It establishes her motive.").

> **5. Category Five: The August 2006 money seizure in Los Angeles is probative of Holloway's motive to join the conspiracy charged in Count One and carry out the kidnapping charged in Count Two.**

In August 2006, Holloway expressed to Person #4 that he was having problems with his drug operation in California; this was another excuse for why he was unable to pay Person #4 for the money he was owed from their operation that Holloway carried on while Person #4 was incarcerated for 30 months. On the day before Taylor's kidnapping, a package containing over

$100,000 in cash was seized by law enforcement in California, and the recipient of that package provided a former address that belonged to Holloway. Regardless of whether Holloway suggests that this was mere coincidence, the money seizure is probative of Holloway's motivation to commit the kidnapping and squarely fits with Person #4's accounting of Holloway's statement about his losses in the California drug business; it is also temporally relevant as it occurred one day before Taylor's kidnapping. For similar reasons articulated in Categories Three and Four above, this evidence should be admissible to provide contextual background for the jury about Holloway's predicament and under Rule 404(b) as evidence demonstrating his motive to commit the kidnapping. *See, e.g.*, *Candelaria*, 2024 WL 727708, at *3 ("Related to the crimes of bank fraud and bank robbery, Defendant's debt history and cashflow immediately preceding the alleged crimes, as they pertain to Defendant's extensive gambling history and potential losses, are inextricably intertwined. . . . Defendant's debt history in the months preceding the alleged crimes in conjunction with Defendant's extensive gambling history and losses provide context for the crimes and are necessary for a full presentation of this case to the jury. In addition to the probative value, this Court also finds the proposed background evidence has causal, temporal, and spatial connections to the charged offenses.").

> ### 6.  Category Six: Wicker's cocaine trafficking partnership with Taylor and Co-conspirator #2 is probative of Wicker's knowledge and intent as well as his opportunity and motive to join the conspiracy charged in Count One and aid and abet the kidnapping charged in Count Two.

Atiba Wicker and Shamari Taylor were friends, and Taylor supplied Wicker with cocaine to sell. Co-conspirator #2 was friends with both Wicker and Taylor, and Co-conspirator #2 was also supplied with cocaine from Taylor. The evidence will show that Wicker and Co-conspirator

#2 partnered together on Taylor's behalf to sell a kilogram of cocaine to Holloway and Co-conspirator #1 in the weeks preceding Taylor's kidnapping. This prior drug transaction is intrinsic to the crimes charged because it established the start of the relations between Taylor and Holloway, and explains why Taylor was driving to a cocaine transaction on the night of his abduction. However, the government seeks to introduce evidence of Wicker's drug debt to Taylor, which was amassed over the months leading up to the kidnapping, to establish Wicker's motive to participate in the plot to kidnap, rob, and kill Taylor. In short, the plot was a way to wipe Wicker's drug debt clean. Accordingly, Wicker's drug trafficking history with Taylor is admissible for this purpose.

First, Wicker's earlier drug trafficking with Taylor provides context for the jury in understanding the nature of their relationship and how Wicker knew Taylor possessed a significant quantity of cocaine at the time of the kidnapping. Second, his drug trafficking relationship with Taylor provided Wicker with an opportunity to feed that information to Holloway and his co-conspirators so they could steal cocaine from Taylor during the kidnapping. Pursuant to Rule 404(b), evidence of this nature has been held admissible under circumstances evincing a defendant's knowledge and opportunity to commit a crime. *See, e.g.*, *United States v. Shelow*, 2011 WL 6130974, at *6 (E.D. Pa. Dec. 9, 2011) ("The evidence of Defendant's past fraudulent schemes involving the victims may be probative of his *knowledge* that his activities were fraudulent, his *awareness* of the illegality of his conduct, and his *opportunity* to pray on the victims' trust in order to extract hundreds of thousands of dollars, as he allegedly did numerous times before.") (emphasis added).

Similar to the argument advanced in support of Category One – as it related to Holloway,

Mathis, Scott and Co-conspirator #1 – the background evidence of Wicker's cocaine trafficking history with Taylor and Co-conspirator #2 is admissible to prove Wicker's involvement in the kidnapping conspiracy with Co-conspirator #2. *See, e.g.*, *United States v. Vega*, 285 F.3d 256, 261-64 (3d Cir. 2002) (holding that evidence of involvement in prior drug conspiracy was admissible to prove defendant's knowledge of later conspiracy and his relationship with a co-conspirator); *United States v. Nichols*, 750 F.2d 1260, 1265 (5th Cir. 1985) ("The evidence of defendant's involvement in the earlier cocaine runs was clearly admissible to show that [he] had very recently engaged in transporting cocaine.").

### 7. Category Seven: Wicker's incarceration and parole status is probative and necessary evidence of his opportunity to participate in the conspiracy charged in Count One and accomplish the conspiracy's objective to steal Taylor's drugs and drug proceeds.

Wicker aided and abetted the kidnapping as charged in Count Two and he was a party to the conspiracy charged in Count One. Wicker was not present on the night of the kidnapping and did not participate in the hands-on abduction because he was confined to a halfway house as a result of his curfew, a condition of his state parole. Predictably, Wicker will contend that because he was not present during the kidnapping he was not a party to the conspiracy and was not responsible for the substantive offense of kidnapping and killing Taylor. But, the evidence will establish that Wicker participated in meetings with his co-conspirators leading up to the kidnapping and that he used information he learned from the conspiracy to later direct Person #5 and Person #6 to commit the home invasion robbery at Taylor's mother's house after Taylor was kidnapped. Indeed, Wicker was integral to the conspiracy: (1) he supplied information to Holloway about the large quantity of cocaine that Taylor possessed, setting the plan in motion to kidnap and rob Taylor instead of engaging in further drug transactions with him; and (2) he was

49

responsible for stealing the drugs and money from Taylor's house which was the entire objective of the conspiracy.

Wicker's parole status is important and should not be scrubbed for the jury, as it is relevant to explain his absence on the night of the kidnapping and provides insight into how he had enough natural distance from the rest of his co-conspirators such that he could backdoor the subsequent home invasion without detection from his co-conspirators. Co-conspirator #2 will testify that he relayed contemporaneous information to Wicker about Taylor's kidnapping on the night it occurred and he did so while Wicker was in the halfway house. From a distance, Wicker passed along that information to Person #5 and Person #6 – in essence, directing them to quickly commit the home invasion because Taylor would not be coming home and his co-conspirators may try to get there first.

Wicker's status on parole at the time of the offense conduct is admissible to demonstrate his knowledge and intent to engage in the kidnapping plot and his opportunity to possess the information about Taylor's death such that he could orchestrate the home invasion robbery. *See United States v. Cruz*, 326 F.3d 392, 395 (3d Cir. 2003) ("A defendant's parole status has been held to be probative of why a defendant would take extra steps to hide his criminal activity. Cruz's parole status provided an explanation for why he used the co-defendants to perform the hand-to-hand street transactions. The evidence that Cruz was on parole at the time of the conspiracy charged is therefore probative of a material issue other than Cruz's character.") (internal citations omitted). Because Wicker's defense will be that he was not a party to the kidnapping plot, the government should be entitled to reference his parole status in August 2006. *See id.* ("Cruz's defense at trial was that his physical absence from negotiations and transactions

was proof that he had no involvement in the conspiracy. According to the government's theory

of the case, Cruz used the co-defendants to perform his transactions because it exposed them

rather than him to the risk of law enforcement activity, which was especially important given his

parole status. Therefore, Cruz's parole status is relevant to explain his decision to run his

business in the manner the government alleged."). Notably, the government does not intend to

introduce the charges of conviction that precipitated his parole, just simply the fact that he was

on parole at the time of the kidnapping and was subject to curfew at a halfway house.

Next, the government seeks to introduce evidence of Wicker's incarceration with Co-

conspirator #2 after the kidnapping, as Co-conspirator #2 will testify that Wicker admitted to him

that he planned the home invasion at Taylor's mother's house and directed two men to steal

drugs and drug proceeds there, ultimately resulting in the men shooting Taylor's mother and

sister in the process. The government does not intend to introduce the charges of conviction that

landed Wicker in prison with Co-conspirator #2, just that the two men were later incarcerated

together and discussed the home invasion after Taylor's kidnapping. Wicker's statement to Co-

conspirator #2 is admissible as an admission, and the setting in which that statement occurred

(prison) should be admissible to provide context for how Co-conspirator #2 and Wicker were in

a position to have that conversation. *See United States v. Williams*, 647 F. App'x 144, 148 (3d

Cir. 2016) (holding that testimony and references to the defendant and co-conspirator's time in

jail together were integral to the formation and development of their relationship and established

the details of the murder-for-hire conspiracy).

8. **Category Eight: Mathis and Tuck's prior criminal association is probative evidence of their shared intent to participate in the conspiracy together as charged in Count One.**

Mathis and Tuck have a known history of engaging in criminal conduct together; their documented criminal association dates back to 1993, when they were arrested in a sting operation for plotting an arson in West Philadelphia. As referenced above, Mathis and Tuck will deny involvement in the plot to kidnap Taylor. Indeed, this defense for Tuck is an absolute; at trial in 2007, when he was charged in Philadelphia County with kidnapping Person #1 under the same set of facts, Tuck relied on alibi testimony that he was home at the time of the kidnapping and could not have participated. Accordingly, he will deny any criminal association with Co-conspirator #1 (his cousin) and any of Co-conspirator #1's acquaintances, including Mathis.

Here, the government simply seeks to introduce evidence that Tuck and Mathis know each other and that they have engaged in illegal conduct together previously. There will be no mention of arson or their crimes of conviction as it related to their 1993 case. But, evidence of their prior criminal association is probative of their familiarity with one another and evinces the notion that they have previously acted in concert together, especially when the obvious defense is that they do not know each other and did not participate in the kidnapping together. This is admissible pursuant to Rule 404(b). *See O'Leary,* 739 F.2d 135, 136 (evidence properly admitted to show, *inter alia*, the parties' familiarity with one another, and their coordinated action); *Butch*, 256 F.3d 171 (3d Cir. 2001) (allowing witness in pharmaceutical theft case to testify as to defendant's prior participation in identical theft); *Simmons*, 679 F.2d 1042, 1050 (3d Cir. 1982), *cert. denied*, 462 U.S. 1134 (1983) (holding that evidence may be introduced "to provide necessary background information, to show an ongoing relationship between [the defendant and a co-conspirator], and to help the jury understand the co-conspirator's role in the scheme").

### C.  The Probative Value of All Eight Categories of Evidence is Not Substantially Outweighed by the Potential for Unfair Prejudice

As a general matter, all of the evidence sought to be introduced by this motion is prejudicial in some respect. Indeed, all damning evidence offered against a defendant is prejudicial; this is especially true when it concerns drug trafficking, robberies, and prior crimes resulting in arrest, conviction, incarceration and supervision. But, the Court's inquiry is whether the probative value of the evidence at issue outweighs the resulting prejudice to the defendant. Cautionary instructions to the jury have been time-honored tools to ameliorate harms associated with any prejudice from extrinsic evidence of a criminal nature.

In this case, the defendants are charged with plotting and carrying out a violent kidnapping that resulted in the victim's death, not by misadventure or mistake, but by intentional murder. They carried out their crimes with the object of stealing drugs and drug proceeds. In doing so, they stole a human life. The conduct speaks for itself, it is truly despicable. Direct evidence of the crimes charged carries its own prejudice, and rightfully so. But, admission of the evidence that is the subject of this motion does not run the risk of overshadowing the offense conduct or smearing the defendants with any additional undue prejudice.

In *United States v. Frank*, the District Court provided its logical reasoning when confronted with a Rule 404(b) motion to admit extrinsic evidence of a defendant's prior drug dealing in a kidnapping resulting in death case, ultimately seeking to admit the evidence:

> The Court finds that the strong probative value of the evidence is not substantially outweighed by any prejudice its admission poses to the defendant. *See Pedroza*, 750 F.2d at 201 (narcotics evidence introduced to prove motive for kidnapping); *Pacheco*, 902 F. Supp. at 474 (same). Frank is not charged with minor offenses compared to the narcotics dealings. He is charged with kidnapping in which a death resulted, for which he faces the death penalty, and violations of the Violence Against Women Act. Although, in other contexts, it may be true that evidence of

drug dealing should be excluded from a non-narcotics trial, *see United States v. Ong*, 541 F.2d 331, 339-40 (2d Cir. 1976) (acknowledging potential for unfair prejudice but nevertheless upholding admission of evidence of narcotics dealings in bribery prosecution), that is not the case here. Given the other, arguably much more inflammatory, evidence that will be before this jury—for example, evidence of Price's abduction and death—it cannot reasonably be said that allowing evidence of Frank's drug dealings would be unfairly prejudicial. In any event, the probative value of this motive evidence strongly outweighs any prejudicial impact. It is hard to imagine what other, less prejudicial, evidence the Government could offer in the place of this evidence that would accomplish the same purpose. *Compare Old Chief v. United States*, 117 S.Ct. 644, 653-55 (1997).

In sum, the Court finds that evidence of Frank's narcotics dealings is highly probative of his motive to commit the crimes charged in the indictment and is necessary to complete the story of the crimes charged. The probative value of this evidence is not outweighed by any unfair prejudice to the defendant. Nor is this evidence likely to confuse the jury. The Court will instruct the jury that it may take this evidence into account at the guilt phase only for the purpose of considering Frank's motive to commit the crimes charged and to understand the background of the crimes. *See Pipola*, 83 F.3d at 566. Jurors may be presumed to follow such instructions. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

[11 F. Supp. 2d 314, 317-18 (S.D.N.Y. 1998).]

The government urges this Court to take the same approach to the evidence at issue here.

Further, using Rule 404(b), the Third Circuit has allowed the admission of evidence that was arguably far more prejudicial than the offense conduct. For example, in *Green*, the defendant was charged with attempted possession of a kilogram of cocaine with intent to distribute. The Court held that the district court did not abuse its discretion in admitting evidence regarding the defendant's efforts to acquire dynamite in order to kill an undercover officer involved in an earlier case, because the evidence helped explain the conversations between the defendant and a cooperator, and to explain the cooperator's motives in assisting law enforcement. 617 F.3d at 250-51. The Court added, "We note that we have rejected Rule 403 challenges to the admission of evidence that was just as prejudicial as the evidence at issue

54

here." *Id.* at 252. The Third Circuit has held similarly in other cases. *See, e.g.*, *United States v. Scarfo*, 850 F.2d 1015, 1020 (3d Cir. 1988) (evidence of uncharged murders); *United States v. Sriyuth*, 98 F.3d 739, 748 (3d Cir.1996) (finding that the sexual assault evidence was relevant and that its probative value substantially outweighed the danger of unfair prejudice to the defendant in a kidnapping trial); *United States v. Daraio*, 445 F.3d 253, 264-66 (3d Cir. 2006) (holding that evidence of defendant's uncharged tax evasion was relevant and admissible to show defendant's intent in failing to pay over payroll taxes).

With respect to the Eight Categories of evidence, all of it is grounded in the same principles: to establish context for the jury regarding the relationships between the defendants, cooperating witnesses and the victim; and to establish the defendants' motivations for joining the conspiracy and committing the kidnapping. Without this evidence, the jury is left to consider the kidnapping in a vacuum without analyzing the how and why it happened. Plainly, the jury needs this evidence and Rule 404(b) provides an avenue for its admission.

Relatedly, Federal Rule of Evidence 403 permits a district court to exclude relevant evidence only if the evidence's probative value is *substantially* outweighed by the danger of *unfair* prejudice. Fed. R. Evid. 403 (emphasis added). "Unfair prejudice" refers to an undue tendency to suggest a decision on an improper basis. *See* Fed. R. Evid. 403, Advisory Committee Notes. Rule 403 does not entail a simple "balancing." The rule makes clear that exclusion is allowed only if the prejudicial impact "substantially outweighs" the probative value. In part, this means that the test is almost surely not met where the probative value of the evidence is itself high. The remedy of exclusion is "extraordinary" and should be applied sparingly, while the balance should be struck in favor of admissibility. *See United States v. Terzado-Madruga*, 897

F.2d 1099, 1117 (11th Cir. 1990); *accord*, *United States v. Dennis*, 625 F.2d 782, 797 (8th Cir. 1980); *United States v. Day*, 591 F.2d 861, 878 (D.C. Cir. 1978). The application of the Rule "does not generally require the government to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone." *United States v. Cross*, 308 F.3d 308, 325 (3d Cir. 2002) (internal citation omitted). "The mere fact that other witnesses may testify to a particular fact does not necessarily render the testimony on the point cumulative or prejudicial." *United States v. LaVictor*, 848 F.3d 428, 448 (6th Cir. 2017) (citing *Ayers v. City of Cleveland*, 773 F.3d 161, 169 (6th Cir. 2014)).

Here, the probative value outweighs the prejudice of the evidence and limiting instructions would mitigate any risk of prejudice. *See LaVictor*, 848 F.3d at 448 ("We see nothing unreasonable in the fact that the district court allowed three similarly-situated separate females to testify about instances of physical abuse. Furthermore, a limiting instruction was given informing the jury on the proper use of the evidence, which ameliorated the risk of unfair prejudice.") As the Third Circuit has recognized, appropriate limiting instructions minimize any potential for unfair prejudice and ensures that the jury does not consider the evidence for an improper purpose. *See, e.g.*, *United States v. Lee*, 612 F.3d 170, 191 (3d Cir. 2010); *United States v. Sriyuth*, 98 F.3d 739, 748 (3d Cir. 1996); *United States v. Driggs*, 823 F.2d 52, 54 (3d Cir. 1987) ("[A] jury could be expected to compartmentalize the evidence and consider it for its proper purposes.").

The government submits **Exhibit A**, proposed limiting instructions concerning the purposes for which the Eight Categories of evidence may be used, *i.e.*, to consider the defendants' associations, their motives, their *modus operandi*, and their knowledge, intent and

opportunity to commit the offense conduct. Thus, all prongs for admission under Rule 404(b) have been met.

## VII.    ADDITIONAL EVIDENCE

The government has set forth with particularity the evidence that it seeks to introduce as admissible under Rule 404(b) of the Federal Rules of Evidence. The government further respectfully requests that it be permitted to supplement this particular request with additional requests if the government comes to believe during the course of its trial preparation that such additional evidence would be useful to the jury in its determination of a fact material to a disputed element, or should the government learn of additional evidence.

## VIII.   CONCLUSION

For all of these reasons, the government respectfully requests that this Court enter an Order admitting the Eight Categories of evidence because the evidence provides necessary and critical background information for the jury and it is probative of combinations of the defendants' motive, knowledge, intent, opportunity, and *modus operandi* in committing the crimes charged in Counts One and Two of the indictment.

Respectfully Submitted,

DAVID METCALF
United States Attorney

*/s/ Justin Ashenfelter*
JUSTIN ASHENFELTER
Assistant United States Attorney

Date: July 21, 2025

57

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Government's Motion *in Limine* to

Admit Evidence Pursuant to Federal Rule of Evidence 404(b) and Exhibit A have been served by

me, via ECF, upon defense counsel:

Alan Tauber and William Brennen, Esqs.
(Counsel for Defendant Kevin Holloway)

David Nenner, Esq.
(Counsel for Defendant Mark Scott)

Nina Spizer, Esq.
(Counsel for Defendant Linton Mathis)

Caroline Donato, Esq.
(Counsel for Defendant Atiba Wicker)

Jeremy H.G. Ibrahim, Esq.
(Counsel for Defendant Kenneth Tuck)

*/s/   Justin Ashenfelter*
JUSTIN ASHENFELTER
Assistant United States Attorney

Date: July 21, 2025